DA 13-0489

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 250

DONALD C. MARKS,

        Objector and Appellant,

  v.

71 RANCH, LP,

        Claimant and Appellee.

APPEAL FROM:    Water Court of the State of Montana,
                Cause No. 41I-398, Honorable C. Bruce Loble, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Donald C. Marks, self-represented; Helena, Montana

        For Appellee:

            John P. Poston, Attorney at Law; Helena, Montana

            W. John Tietz, Mark R. Taylor; Browning, Kaleczyc, Berry & Hoven,
            P.C.; Helena, Montana

                      Submitted on Briefs:  August 6, 2014
                                Decided:  September 16, 2014

Filed:

            _____
                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Donald C. Marks (Marks) appeals from the decision of the Montana Water Court (Water Court), dismissing his objection to the claimed point of diversion and place of use for water rights owned by 71 Ranch, LP (71 Ranch). We affirm.

¶2 We address the following issue on appeal:

¶3 *Did the Water Court err by concluding that Marks failed to present sufficient evidence to rebut 71 Ranch's claimed point of diversion and place of use for its water rights?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This case involves a dispute over the purported change in the point of diversion and place of use for four water rights (Creek Rights) located on Confederate Creek and held by 71 Ranch.[1] The Creek Rights have a priority date of 1866 and comprise a combined flow rate of 385 miner's inches. Confederate Creek flows from the northeast to the southwest and is wholly located within Broadwater County, Montana.

¶5 In 1940, the Creek Rights were decreed (*Rankin* Decree) to Wellington Rankin (Rankin). The *Rankin* Decree identified a point of diversion and place of use for the Creek Rights that coincides with a location on the lower portion of Confederate Creek (downstream location).[2] The *Rankin* Decree described Confederate Creek as a single, unified water system.

---

[1] The respective Creek Rights are Water Right Nos. 41I 89265-00, 41I 89270-00, 41I 89271-00, and 41I 89272-00.

[2] The legal description of the points of diversion are in Broadwater County, in the NENE of Section 6, Township 8 North, Range 2 East and Section 29, Township 9 North, Range 2 East, P.M.M.

2

¶6     In 1950, Rankin sold the property at the downstream location that had served as the place of use for the Creek Rights to the United States.  Rankin, however, properly severed and retained the Creek Rights from the appurtenant land.  In the mid-1950s, the United States constructed Canyon Ferry Reservoir and flooded the former place of use. The property has remained inundated.

¶7     In 1982, Louise R. Galt (Galt), the surviving spouse and successor in interest to Rankin, and predecessor in interest to 71 Ranch, filed Statements of Claim for the Creek Rights.  Galt described a new point of diversion and place of use for the Creek Rights. She identified a location on the upper portion of Confederate Creek (upstream location),[3] approximately 3 miles upstream from the former downstream location.

¶8     In addition to the Creek Rights, Galt has historically owned numerous other water rights on Confederate Creek (Galt's Confederate Creek Rights).  Although Galt's Confederate Creek Rights are not the subject of this appeal, many of her rights are situated at the upstream location.  Galt's Statements of Claim describe overlapping places of use for those rights and the Creek Rights.

¶9     Marks timely filed an objection to the Creek Rights' place of use and point of diversion.  Marks is a water rights holder on Confederate Creek; he is positioned between the claimed upstream location and the former downstream location.  Marks' water rights are junior to the Creek Rights.

---

[3] The legal description of the point of diversion is in Broadwater County, in the SWSENW of Section 16, Township 9 North, Range 2 East, P.M.M.

¶10 In 2002, the matter proceeded to hearing before the Water Master. The Water Master entered findings of facts and conclusions of law, dismissing Marks' objection. The Water Master determined the "clear implication is that the points of diversion and/or places of use for these rights were changed between the issuance of the *Rankin* Decree and July 1, 1973" from the downstream location to the upstream location. The Water Master concluded that Marks had failed to carry his burden to rebut the prima facie proof of content that the Statements of Claim constituted pursuant to § 85-2-227(1), MCA.

¶11 Marks objected to the Water Master's findings and renewed his arguments before the Water Court. The Water Court affirmed all of the Water Master's findings of fact and conclusion of law with respect to the Creek Rights. The Water Court determined the record supported the Water Master's conclusion that the point of diversion and place of use for the Creek Rights had been properly moved prior to July 1, 1973.

## STANDARD OF REVIEW

¶12 In cases involving a Water Master's report and a Water Court's opinion, there are two relevant standards of review: "the standard the water judge applies to the Water Master's report and the standard we apply to the Water Court's opinion." *Heavirland v. State*, 2013 MT 313, ¶ 13, 372 Mont. 300, 311 P.3d 813. "[T]he Water Court reviews the Water Master's findings of fact for clear error and the Water Master's conclusions of law for correctness." *Heavirland*, ¶ 14; *see also* Rule 23, W. R. Adj. R. To determine whether factual findings are clearly erroneous, a three-prong test is applied: (1) whether substantial evidence supports the findings of fact; (2) whether the fact finder

4

misapprehended the effect of the evidence; and (3) whether a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. *Weinheimer Ranch, Inc. v. Pospisil*, 2013 MT 87, ¶ 27, 369 Mont. 419, 299 P.3d 327.

¶13 We apply the same standards of review to the Water Court as we do to an appeal from a district court. "Whether the standard of review was applied correctly is a question of law." *Heavirland*, ¶ 15. Therefore, the Water Court's decision is reviewed under a *de novo* standard to determine whether it correctly applied the clear error standard of review to the Water Master's findings of fact, and whether its conclusions of law are correct. *Heavirland*, ¶ 15.

## DISCUSSION

¶14 *Did the Water Court err by concluding that Marks failed to present sufficient evidence to rebut 71 Ranch's claimed point of diversion and place of use for its water rights?*

¶15 Marks challenges the Water Court's conclusion that he failed to present sufficient evidence before the Water Master to rebut 71 Ranch's claimed point of diversion and place of use for the Creek Rights. Pursuant to § 85-2-227(1), MCA, "a claim of an existing right . . . constitutes prima facie proof of its content until the issuance of a final decree." The effect of § 85-2-227(1), MCA is to place the burden of proof on the objector "to prove by a preponderance of the evidence that the elements of the original claim do not accurately reflect the beneficial use of the water right as it existed prior to July 1, 1973." *Nelson v. Brooks*, 2014 MT 120, ¶ 37, 375 Mont. 86, 329 P.3d 558 (internal quotations omitted). Objections to the validity of a water right as it existed prior

5

to July 1, 1973, are governed by pre-1973 law. *Axtell v. M.S. Consulting*, 1998 MT 64, ¶ 25, 288 Mont. 150, 955 P.2d 1362.

¶16 Galt properly filed Statements of Claim under § 85-2-227(1), MCA. Galt's filed claim thus constituted prima facie evidence that the information contained in the claim is true. *Weinheimer*, ¶ 28 (citations omitted). It was Marks' burden to show by a preponderance of the evidence that the information in the claim is incorrect. *Weinheimer*, ¶ 28 (citations omitted). Further, the preponderance of the evidence standard applies to "'every assertion that a claim is incorrect . . . .'" *Weinheimer*, ¶ 21 (quoting Rule 19, W. R. Adj. R.).

¶17 Marks advances three assertions in support of his objection to the claimed point of diversion and place of use for the Creek Rights. First, Marks argues the Creek Rights were not beneficially used at the upstream location prior to July 1, 1973. Second, Marks argues the upper and lower portions of Confederate Creek have different "water supply sources." Lastly, Marks argues the Creek Rights were abandoned. We address each argument in turn.

### (1) Beneficial Use

¶18 Marks challenges the Water Master's finding that he failed to present sufficient evidence to demonstrate the Creek Rights were not beneficially used at the upstream location prior to July 1, 1973. Prior to 1973, an appropriator could change the place of use and point of diversion of a water right so long as the appropriator beneficially used the water right at the new location and did not cause injury to other appropriators.

Section 89-803, R.C.M. 1947 (repealed in 1973). Marks concedes he was not injured prior to 1973.

¶19 Instead, Marks contends insufficient water was delivered to the upstream location to justify the Water Master's finding that the Creek Rights were beneficially used. To support his contention, Marks introduced records of the Confederate Creek water commissioner for various days in June 1957, June 1958, June and July 1959, the entire irrigation season in 1962, and various days in May, June, and July of 1966. The records indicate that on none of the respective days was there more than 360 miner's inches of water delivered to the upstream location. Marks also testified that Galt's Confederate Creek Rights situated at the upstream location total 450 miner's inches. Marks theorizes there would have been considerably more water delivered to the upstream location if the Creek Rights had been beneficially used there, *i.e.*, enough water for Galt's Confederate Creek Rights that are situated at the upstream location (totaling 450 miner's inches), in addition to the Creek Rights (totaling 385 miner's inches), instead of the mere 360 miner's inches actually delivered.

¶20 The Water Master reasoned that "the water commissioner records alone are of limited value in proving the maximum flow rate actually diverted during a given season or proving actual nonuse of particular water rights." The Master outlined several reasons for this finding: the records do not include the total amount of water delivered during the irrigation season; the records do not include the diversions made during high flows when no water commissioner was appointed; the records do not disclose the stream flow

7

conditions to determine whether more than the allocated amount was available in Confederate Creek; and, lastly, the records do not disclose whether the delivery of more water was ever called on or refused.

¶21 We conclude the Water Master did not misinterpret the effect of the water commissioner records. The records offer little to demonstrate the historical amount of water utilized at the upstream location. As the Water Master noted, because "water commissioners are usually appointed when there is insufficient flow to satisfy all rights on a source, it is implicit that once a water commissioner is appointed, water rights will start being shut off, so the quantities listed on water commissioner records are usually the quantities in times of shortage." *See, e.g., Quigley v. McIntosh*, 110 Mont. 495, 103 P.2d 1067 (1940). Consequently, it was a reasonable assumption that the records reflected flow during low flow years. Thus, given the complete absence of any flow data in the years 1950-1956, 1960-1961, 1963-1965, and 1967-1973, the lack of data signifying total flow volume during any irrigation season, and the failure to submit any evidence indicating that more water was or was not available during the days recorded, the Water Master did not err by determining that the records had little probative value concerning whether the Creek Rights were beneficially used at the upstream location.

¶22 Our review of the record convinces us that substantial evidence supports the Water Master's finding and does not leave us with a definite and firm conviction that a mistake was committed. The Water Court appropriately affirmed the Water Master's

8

determination that Marks failed to carry his burden to rebut the prima facie proof that the Creek Rights were beneficially used at the upstream location prior to July 1, 1973.

### (2) Water Sources

¶23    Marks challenges the Water Master's determination that he failed to present sufficient evidence that the upper portion of Confederate Creek and the lower portion of Confederate Creek are separate water sources.[4]

¶24    Marks' testimony did not clearly delineate the precise location of the end of the upper portion or the beginning of lower portion of Confederate Creek. Instead, Marks testified the division of the two portions is in the vicinity of Highway 284. He testified that Highway 284 crosses Confederate Creek above the lower portion of Confederate Creek. He also testified Confederate Creek dries up around Highway 284 and the area usually stays dry during the summer months.

¶25    Tom O'Donnell (O'Donnell), the 2002 water commissioner, testified on Marks' behalf. O'Donnell testified that Confederate Creek recharges somewhere between Highway 284 and Canyon Ferry Reservoir. However, O'Donnell's testimony seemed to conflict with Marks' testimony as O'Donnell conceded that water does flow past Highway 284 during the spring flood period.

---

[4]  Marks does not elaborate on the legal import of his assertion that Confederate Creek has more than one water source. He offers that the lower portion is "a recharging of the creek waters from natural springs" and that "[i]ts waters cannot be moved from the lower source to the upper source by natural means." The Water Master noted an absence of "evidence of two hydrologically distinct sources of water and legal authority that it would have been improper to change from a lower supply to an upper supply . . . ."

¶26     The Water Master properly afforded the *Rankin* Decree significant weight. "A decree of a court stands as an absolute finality, not merely as to the conclusions expressed, but as to everything directly or implicitly involved in reaching them." *Missoula Light & Water Co. v. Hughes*, 106 Mont. 355, 366, 77 P.2d 1041, 1047 (1938) (internal quotations omitted). The *Rankin* Decree described Confederate Creek as a single, unified water system. The *Rankin* Decree did not separately decree water rights for an upper and lower Confederate Creek, but instead as a single water system.

¶27     The *Rankin* Decree provides the most objective evidence of Confederate Creek's characteristics prior to July 1, 1973. The *Rankin* Decree was issued in 1940. Marks moved to the Confederate Creek area in 1974 and O'Donnell testified he had no knowledge of how Confederate Creek operated prior to 1973. Neither Marks nor O'Donnell profess to be hydrologists and neither measured the water below Highway 284. Marks presented no evidence as to the actual amount of water diverted through the upper and lower portions of Confederate Creek. In light of the *Rankin* Decree and in the absence of any reliable evidence that the upper and lower portions of Confederate Creek are sourced separately, the Water Master correctly comprehended the evidence. Substantial evidence supports the Water Master's findings and our review of the record does not leave us with a definite and firm conviction that a mistake has been made. The Water Court did not err by upholding the Water Master's findings.

10

### (3) Abandonment

¶28   Marks challenges the Water Master's determination that he failed to present sufficient evidence to demonstrate that the Creek Rights were abandoned. Once an appropriator abandons a water right, the right ceases. *Holmstrom Land Co. v. Meagher Cnty. Newlan Creek Water Dist.*, 185 Mont. 409, 423, 605 P.2d 1060, 1068 (1979) (citation omitted). A finding of abandonment requires the showing of two elements: "nonuse and intent to abandon." *Heavirland*, ¶ 23 (citation omitted).

¶29   Marks' argument that the Creek Rights were abandoned is intertwined with his earlier argument that the Creek Rights were not beneficially used at the upstream location. Marks argues that, because the Creek Rights were not beneficially used at the upstream location, and because 71 Ranch does not claim use of the rights elsewhere, the rights were dormant for over twenty years and therefore should be presumed abandoned. To establish non-use of the Creek Rights, the only evidence introduced by Marks were the same water commissioner records he offered to prove that the Creek Rights had not been beneficially used.

¶30   As we have explained herein, the water commissioner records are inadequate, standing alone, to prove non-use, and Marks' abandonment argument necessarily fails. We are not left with a definite and firm conviction that the Water Master reached a mistaken conclusion. The Water Court appropriately determined that Marks failed to present sufficient evidence to demonstrate the Creek Rights were abandoned.

11

¶31 The Water Court correctly concluded that Marks failed to present sufficient evidence to contradict 71 Ranch's claimed point of diversion and place of use for its water rights under applicable pre-1973 water law. The Water Court's opinion is affirmed.


/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ MICHAEL E WHEAT