JUSTICE WHEAT
delivered the Opinion of the Court.
¶1 Gene R. Curry, Cheryl S. Curry, and Curry Cattle Co. (Curry) appeal from an order of the Montana Water Court that determined Pondera County Canal & Reservoir Company (Pondera) is entitled to claim beneficial use based on the maximum number of shares authorized by the Montana Carey Land Board (MCLB), a service area for its place of use, the extent of the acreage included in the service area, the adjustment of the flow rate for Claim Nos. 41M 162000-00 and 41M 162109-00, and the reversal of the dismissal of Claim No. 41M 199797-00. Pondera cross-appeals from the portion of the order regarding the tabulation for Claim Nos. 41M 131103-00 and 41M *95 199796-00. We affirm in part, reverse in part, and remand for further proceedings.
ISSUES
¶2 We review the following issues:

1. Did the Water Court err when it determined the water rights of an entity developed under the Carey Land Act for the purpose of sale or rental are not limited by the stockholders’ actual historic water use?

2. Did the Water Court err when it granted Pondera a “service area” rather than a place of use based on historically irrigated land?

3. Did the Water Court err by ruling Pondera’s storage rights were beneficially used on the Birch Creek Flats prior to 1973?

4. Did the Water Court err by substituting its judgment for the trier of fact in regard to Claim Nos. 41M162000-00 and 41M162109-00 (Gray Right), and Claim No. 41M199797-00?

5. Should the Water Court’s tabulation for Claim Nos. 41M 131103-00 (Curry claim) and 41M 199796-00 (Pondera claim) include volume measurements?

We address each issue in turn.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 The present case originates from a water distribution controversy on Birch Creek, a tributary of the Marias River. Both Curry and Pondera own rights to divert waters from Birch Creek. This case is before this Court as a result of a certification order from the Ninth Judicial District Court, Pondera County, which referred the case to the Water Court for the “determination of the existing water rights that are involved in [the] matter.” The water rights that are the subject of this appeal are located in the Marias River Basin, 41M, which has yet to receive final adjudication. Subsequent to the filing of this appeal a preliminary decree was entered, and now it controls the rights in the Basin. Accordingly, the Court recognizes all water users in this Basin, including the parties to this appeal, will have an opportunity to fully participate in the adjudication process and additional litigation related to the rights at issue herein may occur.
A. Historical and Factual Background
¶4 Pondera is a water supply company organized under Montana law, which supplies water to Pondera County residents primarily for irrigation. Pondera owns rights to divert water from Birch Creek. In addition to its Birch Creek water rights, it owns a complete *96 distribution system, including canals, ditches, siphons, andheadgates.
¶5 Pondera’s predecessors secured some of its water rights through use of the Carey Land Act, a federal act that encouraged settlement of the arid West.[1]43 U.S.C. §§ 641-644 (2012). This federal law provided for the passage of fee title to federal lands to state settlers if the state complied with various prerequisites. To ensure the procedures were properly followed states created Carey Land Boards to manage the process. Typically, Carey Land Act projects occurred and passed title in a systematic fashion. First, the federal government promised title to arid lands to a state upon the conditions of both reclamation and actual settlement of the land. Next, the state contracted with a construction company to construct an irrigation system to service the land and to secure settlement of the land by settlers. Once construction of the irrigation system was complete, the state could request the patents of the land from the federal government. Upon approval by the Carey Land Board, the construction company could sell shares of stock in an operating company to settlers and the state could sell the patented land serviced by the irrigation system to the stockholder-settlers. Thus, the operating company was comprised of stockholders who had the right to water per acre of land owned, and also proportionate ownership in the irrigation system. Once 90% of the total stock was sold by the construction company to settlers, the ownership of the system was turned over to the operating company. Ultimately, the settler-shareholders owned the land upon which the water was used, had ownership in the operating company, but the operating company itself retained ownership of the water rights.
¶6 The original appropriators of the rights now owned by Pondera began appropriating water for the purpose of irrigating and selling water to other irrigators. The Conrad brothers acquired these rights and appropriated water in order to irrigate approximately 50,000 acres of their land in the Marias River Valley. At some point in the late 1800s, the Conrads hired an engineer to construct a ditch system to divert water from Birch and Dupuyer Creeks, which was approximately fifty miles in length and irrigated a portion of their land, in the range of five to six thousand acres. This land was irrigated under the Conrad Investment Company. The Conrads also organized the Pondera Canal Company to sell water they diverted from the Lake Francis Reservoir into a diversion to the Dry Fork of the Marias. This *97 company project irrigated approximately 13,000 acres of shareholder land. The current Pondera project is an extension of these two original systems.
¶7 In 1908 the Conrads sold their land and holdings to W.G. Cargill. Cargill and the same engineer hired to develop the Conrads’ first original system then began efforts to irrigate under the then recently-enacted Carey Land Act provisions. Pursuant to the Carey Land Act, two companies were formed: a construction company and an operating company. The operating company went through various name changes and was eventually organized as Pondera in 1927. In 1948, the physical construction of the project was completed and a request for final approval was filed with the MCLB. The MCLB approved the project as complete in 1953, at which time Pondera took ownership of the project from the construction company. Prior to the MCLB’s final approval, the development of the project required an independent assessment of the ability to provide an adequate supply of water. Both the MCLB and the federal government were involved in determining whether the Pondera project could properly supply water to its shareholders.
¶8 Similar to other operating companies formed under the Carey Land Act, Pondera is owned by its membership and water is distributed to shareholders on a per-share-owned basis. Generally, the water rights are appurtenant to the land described in the share certificates issued by Pondera to its shareholders. Under the development of the project the settler-shareholders did not receive individual water rights to irrigate their land, but instead they received the right to available water in common with other settler-shareholders regardless of when they purchased their shares or when they initially irrigated their land.
¶9 Initially the Ponder a project sought to irrigate 160,000 acres. Over time this irrigable acreage amount was reduced. The State engineer assigned to the project concluded in his final evaluation that the lands contemplated would be serviced by the issuance of a maximum of 72,000 shares, with each share equivalent to one acre of irrigable land.[2] Pondera’s bylaws contemplate the movement of water within the project’s boundaries. Specifically, they state:
[T]he shares and water rights evidenced thereby shall become and *98 forever be inseparably appurtenant to such lands, subject, nevertheless, to the power of the Board of Directors of this corporation, for good cause shown, at the request and with the consent of the owner thereof, to make said certificate of stock appurtenant to other land which is so located that the Irrigation System as then and now constructed can readily and efficiently serve the same.
¶10 Curry is a private landowner with irrigation water rights at various locations in an area known as the Birch Creek Flats (the Flats). Curry came into possession of his lands and appurtenant water rights beginning in 1988. Some of Curry’s rights are of the oldest in Basin 41M. For many years, Curry and Pondera both received water from Birch Creek despite disagreeing over the priorities of each other’s rights. In 2004, Pondera advised Curry of what it believed to be the extent of Curry’s water rights, which was less than what had been previously indicated by a former Pondera employee. Then in 2005 Pondera locked Curry’s headgate, which left him without water and ultimately led to the current dispute.
B. Procedural History
¶11 In June 2005, Curry filed a complaint in the Ninth Judicial District Court, Pondera County, which alleged interference with his water rights by Pondera. In August 2005, Curry filed a motion for preliminary injunction and certification to the Water Court for a determination of Curry’s and Pondera’s competing water right claims. The District Court certified the case to the Water Court regarding the determination of the water rights, and conducted a hearing regarding the issuance of a preliminary injunction. In May 2006, the District Court issued a preliminary injunction that enjoined Pondera from interfering with Curry’s water diversion from Birch Creek.
¶12 Upon certification to the Water Court, the case was referred to a Water Master to hear all matters in the case. In August 2008, Curry filed a motion for partial summary judgment and to compel discovery. Initially Pondera claimed a “service area” of 377,813.5 acres as its place of use. In its summary judgment briefing, Pondera conceded that the 377,000-acre service area did not accurately represent actual irrigated acreage, and agreed it would not oppose the removal of the acreage amount as its place of use. Instead, it stated it would agree to use the legal descriptions of the land within the service area, as identified by Township and Range, as the appropriate descriptor of the service area. A six day hearing was held that involved extensive testimonial and documentary evidence regarding all of Curry’s and Pondera’s water right claims on Birch Creek.
*99 ¶13 In April 2013, the Water Master issued a report with findings of fact and conclusions of law regarding each claimed water right. The Water Master found, in part, that the maximum number of acres Pondera is allowed to irrigate is 57,073 acres within the designated place of use. The Master found although the MCLB authorized the sale of 72,000 shares (i.e. representing 72,000 irrigable acres), the evidence showed the greatest number of actual irrigated acres prior to the implementation of the Montana Water Use Act (WUA) in 1973[3] was 56,556 in 1921. Further, even post-WUA the greatest number of actual irrigated acres was 70,030 in 2003. Thus, according to the Master, 72,000 acres were never historically irrigated since the project’s completion and the 57,073-acre figure represents the greatest number of actually irrigated acres pre-WUA, plus an allotment for an amount of water to service the shareholder city of Conrad.
¶14 In regard to the place of use, the Master found Pondera’s claim of a service area of over 377,000 acres was based on convenience because it was the amount of land Pondera’s entire infrastructure could potentially service, but had never historically serviced. In lieu of Pondera’s requested use of a service area for its place of use, the Master found the land described on the share certificates with appurtenant water rights is the only land that can and should be irrigated by Pondera water. The Master cited McDonald v. State, 220 Mont. 519, 722 P.2d 598 (1986), and Schwend v. Jones, 163 Mont. 41, 515 P.2d 89 (1973) in support of the appurtenance requirement. The Master requested Pondera supplement the record with a list of share certificates issued with the appurtenant acres stated as of July 1,1973, the date the WUA went into effect. According to the Master, after allowing Curry to respond to the list, the historical place of use could then be accurately determined. The Master noted:
The place of use so delineated will be larger than the number of historically irrigated acres, because shareholders have the flexibility to irrigate less than all of their acreage at any time .... For example, if a share certificate is for 40 acres and describes the S2SE section 17 (80 acres), the place of use will be S2SE of section 17. The shareholder may use the allotment of 40 shares’ water on any of the 80 acres described in any given year. If the shareholder wishes to use those shares to irrigate land in the N2SE of section *100 17, a [Montana Department of Natural Resources and Conservation (DNRC)] change authorization is required. This is no more and no less than is required of any other water right holder in Montana.
¶15 The Master also excluded the Flats from Pondera’s service area. The Master stated that while Pondera did at times release water to ditches on the Flats, the water used on the Flats prior to 1973 was nonPondera water. The Master explained:
There is evidence that [Pondera] accommodated other water users on the Flats from time to time. [Pondera] asserts that it released water to non-project users in order to be a good neighbor, without regard for priority dates, and that it did not distinguish whether it was using direct flow water or stored water.... When [Pondera] accommodated its neighbors, at times it was effectively honoring their senior rights. Senior direct flow rights in priority are by definition using the unstored flow of the source. [Pondera] may have voluntarily substituted stored water [but] ... [t]hat practice did not create storage rights for the neighbors who were accommodated. [Pondera] may have had no idea what the instantaneous natural flow of Birch Creek was at the time. In comparison to the size of the [Pondera] enterprise, the few second feet needed by a user on the Flats were minimal. [Pondera’s] practice of accommodating non-[Pondera] water users on the Flats from time to time did not make the users’ ditches on the Flats part of [Pondera’s] historical delivery system.
¶16 In April 2014, the Water Court issued an order amending and partially adopting the Master’s report. The court disagreed with the Master’s conclusions regarding the maximum number of acres that Pondera could irrigate, the size of the place of use, or service area, and the exclusion of the Flats in the service area. Instead, the court found the number of shares authorized by the MCLB accurately reflects the number of acres Pondera is allowed to irrigate. The court reasoned that at the time the MCLB fixed the 72,000 share limit 69,257 acres had already been sold to landowners. Thus, due to the intent of the project and the State’s determination of the maximum allowable irrigable acres, the Master improperly diluted the value of the shares.
¶17 The court further determined there was no legal basis for the Master’s conclusion that the land described on the share certificates as of July 1, 1973, was the place of use or service area. It found Pondera is entitled to claim a service area for its place of use. Furthermore, it found the 377,000-plus acres Pondera originally claimed as its service area is appropriate. The court stated Curry was unable to sufficiently *101 meet his burden of proof to show Pondera’s service area of 377,255.5 acres as claimed in 2007 is not the appropriate assessment. The court also found the Flats to be within Pondera’s service area. The court stated the Flats should be included because Pondera had historically delivered direct flow along with stored water to the Flats for use by non-shareholders.
¶18 Curry timely appeals, and Pondera timely cross-appeals, from the Water Court’s order.
STANDARDS OF REVIEW
¶19 Two standards of review are relevant to this case because it involves a Water Master and the Water Court. First, the Water Court must review the factual findings in the Water Master’s report for clear error, and the conclusions of law in the report for correctness. Second, whether the standard of review was correctly applied by the Water Court is a question of law, which we review de novo. Heavirland v. State, 2013 MT 313, ¶¶ 13-14, 372 Mont. 300, 311 P.3d 813. Therefore, we review the Water Court’s order to determine whether it correctly applied the appropriate standards of review to the Master’s findings of fact and conclusions of law. If we find the Water Court correctly set aside a factual determination made by the Master, we review its substitute or additional findings for clear error. Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co., 2014 MT 167, ¶ 26, 375 Mont. 327, 328 P.3d 644 (citations omitted).
¶20 We have previously set forth a three-part test for determining clear error. First, the reviewing court reviews whether the findings of fact are supported by substantial evidence. Second, even if the findings are supported by substantial evidence, a finding may still be clearly erroneous if the trial court misapprehended the effect of the evidence. Third, even if the findings are supported by substantial evidence and the court has not misapprehended the effect of the evidence, a finding may be clearly erroneous when although there is evidence to support the finding, when looking at the evidence as a whole the court is left with the definite and firm conviction that a mistake has been committed. Marks v. 71 Ranch, LP, 2014 MT 250, ¶ 12, 376 Mont. 340, 334 P.3d 373. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if the evidence is weak or conflicting. It need not equal a preponderance of the evidence, but it must be more than a scintilla. Although the standard is deferential, it is not synonymous with clearly erroneous and a reviewing court may find a finding clearly erroneous even though there is evidence to support it. Skelton Ranch, Inc., ¶ 27 (citations omitted).
*102 DISCUSSION
¶21 1. Did the Water Court err when it determined the water rights of an entity developed under the Carey Land Act for the purpose of sale or rental are not limited by the stockholders’ actual historic water use?
¶22 In his report, the Master determined Pondera’s water rights developed under the Carey Land Act should be limited to the actual acreage historically irrigated by the shareholders. The Water Court, however, determined the water rights should be limited to the number of shares authorized by the MCLB upon completion of the system. Both the Master and the court based their determinations in the principles of Montana water law.
¶23 Curry argues beneficial use of water is “the basis, the measure, and the limit of all water rights in Montana, including the rights of water supply companies” such as Pondera. Curry maintains the Water Court’s order and reasoning improperly places Pondera’s water rights in an advantageous position over those of any other water user. Curry argues that the court incorrectly interpreted Bailey v. Tintinger, 45 Mont. 154, 122 P. 575 (1912), by removing the requirement that water used for sale or rental be limited by historic beneficial use.
¶24 Pondera argues its beneficial use is not the actual irrigation of lands, but instead putting the water into service for shareholders for irrigation. Thus, it maintains the Water Court correctly held, pursuant to Bailey, that Pondera has the right to rely on the maximum number of shares authorized by the MCLB (72,000) as the amount of acreage it can irrigate, not the historic number of acres actually irrigated by the shareholders.
¶25 The controlling principle of Montana water law is the right to beneficially use water — without beneficial use the right ceases. Power v. Switzer, 21 Mont. 523, 529, 55 P. 32, 35 (1898); Quigley v. McIntosh, 110 Mont. 495, 505, 103 P.2d 1067, 1072 (1940). Whether an appropriation is made for a beneficial or useful purpose is a question for the courts to determine based on the appropriator’s intent, and contemplated and actual use. Toohey v. Campbell, 24 Mont. 13, 17-18, 60 P. 396, 397 (1900). The appropriation of water for sale has long been accepted as a beneficial use. Bailey, 45 Mont. at 175, 122 P. at 582; Sherlock v. Greaves, 106 Mont. 206, 218, 76 P.2d 87, 91-92 (1938); State ex rel. Normile v. Cooney, 100 Mont. 391, 408, 47 P.2d 637, 645-646 (1935); Mont. Const. art. III, § 15 (1889); Mont. Const. art. IX § 3 (1972). Our first Constitution in 1889 explicitly recognized the right to sell and rent water to others as a beneficial use. Mont. Const. art. III, *103 § 15 (1889).[4] The verbiage used in the 1889 Constitution referencing the sale of water was imported almost verbatim nearly one hundred years later into the 1972 Constitution. Compare Mont. Const. art. DC, § 3 (1972) with Mont. Const. art. Ill, § 15 (1889). This constitutional provision, along with its interpretations in our case law, clearly shows a steadfast commitment to recognizing the ability to appropriate water for its ultimate use by a third party.
¶26 The parties rely on Bailey as the guidepost decision, but disagree over its meaning. We agree Bailey applies to the instant case, and highlight its applicability with the following analysis. To begin, the crux of Bailey was a dispute between landowners with individual water rights and those who received water from an irrigation system operated by a canal company. Bailey, 45 Mont. at 160, 122 P. at 576.
¶27 In Bailey, the defendant canal company began construction of its water distribution system pursuant to the Carey Land Act with the intention to service settler-irrigators from Big Timber Creek. Bailey, 45 Mont. at 160-161, 122 P. at 577; Bruffey v. Big Timber Creek Canal Co., 137 Mont. 339, 341, 351 P.2d 606, 607 (1960). The defendants’ predecessors began appropriating water in 1892 with the intent to irrigate and provide water for sale. Bailey, 45 Mont. at 160-161,122 P. at 577. A canal company succeeded the original appropriators’ interests and continued to expand the system, completing most of the system by 1896. Bailey, 45 Mont. at 161, 122 P. at 577. Eventually the defendants acquired the original canal company’s rights, and “did considerable work on” the irrigation system in 1910. Bailey, 45 Mont. at 161, 122 P. at 577.
¶28 The plaintiffs brought suit to determine the extent of the defendants’ water rights and the case was tried in December 1910. Bailey, 45 Mont. at 161, 122 P. at 577. The trial court found the defendants furnished to their customers: 835 miner’s inches in 1908; 926 inches in 1909; and a maximum of 1, 150 inches in 1910. Bailey, 45 Mont. at 161, 122 P. at 577. The trial court did not enter any specific findings of fact, but determined the defendants’ rights were limited to 1,000 miner’s inches. Bailey, 45 Mont. at 161, 122 P. at 577. The *104 defendants appealed arguing the trial court’s determination was not supported by the evidence. Bailey, 45 Mont. at 161, 122 P. at 577. The plaintiffs-respondents argued the defendants’ “considerable work” amounted to “an enlargement of the [system], as distinguished from repairs or cleaning[.]” Bailey, 45 Mont. at 162, 122 P. at 577.
¶29 On appeal, this Court concluded that the carrying capacity of the system prior to the 1910 work was 1,240 inches, and after the work, which we determined was cleaning not enlargement, was 2,200 inches. Bailey, 45 Mont. at 162-163, 164-165, 122 P. at 577-578. We also held in certain circumstances water possession can either be actual or symbolized by the completion of preparatory work necessary to take actual possession. Bailey, 45 Mont. at 174, 122 P. at 582. We stated:
[W]e base our conclusion that, as to a public service corporation, its appropriation is complete when it has fully complied with the statute and has its distributing system completed and is ready and willing to deliver water to users upon demand, and offers to do so. The right thus obtained may be lost by abandonment or nonuser for an unreasonable time (1 Wiel, sec. 569), but cannot be made to depend for its existence in the first instance upon the voluntary acts of third parties — strangers to its undertaking.
Bailey, 45 Mont. at 177-178, 122 P. at 583.
¶30 Finally, we concluded the appropriator’s needs and capacity measure the extent of the appropriation. “If [the] needs exceed the capacity ... of [the] diversion, then the capacity of [the] ditch, etc., measures the extent of [the] right. (McDonald v. Lannen, 19 Mont. 78, 47 P. 648). If the capacity of [the] ditch exceeds [the] needs, then [the] needs measure the limit of [the] appropriation.” Bailey, 45 Mont. at 178, 122 P. at 583.
¶31 As applied to the facts here, the main propositions that emerge from Bailey are that either the system’s capacity or the company’s needs will determine the extent of the water right, wherein if the needs are less than the capacity, then the measurement of the needs becomes the cap to the water right, and beneficial use is not in-fact use of water by the irrigators, but the company’s ready availability of water to the irrigators. Bailey does not circumvent the fundamental water law maxim that water must be put to beneficial use. Instead, it clarifies a specific way in which water is put to beneficial use that is different from the typical actual, on-the-ground use of water. Still, water’s beneficial use is required for all water appropriators; however, pursuant to Bailey whether it has occurred may be determined by the company’s actions, not those of the shareholders who decide if and *105 when to apply the water to its ultimate, actual use. Bailey, 45 Mont. at 176, 177-178, 122 P. at 582-583.
¶32 Pondera and its predecessors sought to make water available for sale to irrigators in the Basin. In fact, the sole purpose of Pondera’s existence was to sell water availability to its shareholders. The federal Carey Land Act, ratified by the states’ own sister Acts, required that there be enough water available to adequately irrigate the settlers’ land. 43 U.S.C. § 641. The availability of water was determined by the state Carey Land Board and reviewed by the federal government. Here, the final report by the State engineer for the MCLB fixed the maximum number of shares that could be issued by Pondera at any single time at 72,000. This meant Pondera had the ability to issue to shareholders the right to use water to irrigate no more than 72,000 acres of irrigable lands within the area developed under the Carey Land Act and serviced by the system. An additional requirement under the Montana Carey Land Act statutes was that 90% of the authorized shares must be sold by the construction company to settlers prior to the operating company taking ownership of the project, which occurred in this case. Section 81-2111, RCM (1947) (repealed 1965). Therefore, there was enough water available to irrigate 72,000 acres, as determined by the MCLB, and there were enough qualified settlers who bought into the system and began using the water, as determined by the ownership transfer to the operating company Pondera. After the MCLB certified the project in 1953, Pondera had the ability to continue to issue shares to shareholders until it reached the issuance maximum of 72,000 allowed shares for a reasonable amount of time, and the record indicates Pondera continued to do so.
¶33 We have held:
[A] corporation [that] does not own, control, or possess any land is organized for the purpose of selling or renting water to settlers to irrigate arid lands; that it proceeds under the statute to make its appropriation and fully complies with all the statutory requirements, completes its distributing system, and is ready and offers to supply water to settlers upon demand. Now, if the corporation can ever make an appropriation, it has done so, for it has performed every act which it can perform. It cannot use the water itself, for it has no land or other means of use. Any further acts must be performed by its customers who are to be the users.
Bailey, 45 Mont. at 175-176, 122 P. at 582. Furthermore, “[i]t is clearly the public policy of this state to encourage these public service corporations in their irrigation enterprises, and the courts should be reluctant to reach a conclusion which would militate against that *106 policy.” Bailey, 45 Mont. at 177, 122 P. at 583. Therefore, it would be against the policy and intent of the Carey Land Act, as well as Montana law, to hold the acreage actually irrigated by the irrigators should limit Pondera’s water rights developed pursuant to the Carey Land Act. Instead, these rights are limited by the actual shares issued by Pondera within a reasonable amount of time after the completion of the Carey Land Act project in 1953, in the amount determined by the MCLB. Bailey, 45 Mont. at 178, 122 P. at 583. See also Aberdeen-Springfield Canal Co. v. Peiper, 982 P.2d 917, 922 (Idaho 1999) (concluding, “A finding of forfeiture in this case, where the appropriator [canal company] did nothing to cause the nonuse of the water, would have troubling consequences for all Carey Act operating companies. Such a ruling would give stockholders, who are not appropriators, the power to determine the fate of [the canal company’s] water rights.”).
¶34 As stated, because beneficial use is a key tenet of water law Pondera must continue to put its water to beneficial use within the confines of the law. While the sale of water is unquestionably a beneficial use, Bailey clearly states that though the right cannot be lost based upon the acts by a third-party shareholder, it can nevertheless be lost by nonuse or abandonment. Mont. Const. art. IX, § 3 (1972); Bailey, 45 Mont. at 178, 122 P. at 583. The nonuse or abandonment would then be measured by the acts of the company, which we note are not issues contained in this appeal before this Court.
¶35 We do not agree with Curry that the Water Court’s interpretation of Bailey removes the beneficial use requirement for water rights developed under the Carey Land Act. Under Bailey, Pondera put to beneficial use water rights it perfected under the Carey Land Act by providing water for sale and issuing shares of stock up to its allowed acreage maximum as determined by the MCLB. Accordingly, the Water Court did not err, and we therefore affirm the Water Court’s decision that the Master incorrectly determined Pondera’s rights were limited by the actual acreage irrigated by its shareholders.
¶36 2. Did the Water Court err when it granted Pondera a “service area” rather than aplace of use based on historically irrigated land?
f 37 Curry contends the Water Court erred by misinterpreting Bailey to mean Pondera is entitled to a service area that is larger than any historic place of use. Curry also argues Pondera’s rights, like any other water user’s, are appurtenant to the land and therefore the Water Court erred by allowing Pondera a service area instead of a historical *107 place of use.
¶38 Pondera argues that the service area is the appropriate boundary definition for Pondera’s place of use. Further, Pondera contends that the use of a service area is consistent with DNRC guidelines, the Water Court’s precedent, and Montana law’s interpretation of a “public service corporation,” as described in Bailey. Pondera argues its project is similar to an irrigation district, and because it uses no water itself and its sole purpose is to supply water to others, it should be entitled to claim a service area instead of a specific place of use.
¶39 In his report, the Water Master determined that a service area is the incorrect means of defining the boundary of where Pondera can put its water to use. Instead, the Master requested an accounting of the lands described on Pondera’s stock certificates to determine the lands upon which the rights could be used. The Water Court disagreed with this analysis and found a service area properly embodies the intent and history of the project, and is allowed under Montana law.
A. Appurtenance
¶40 All parties discuss the issue of whether the water rights developed under the Carey Land Act should be appurtenant to the land where the water is put to ultimate use. In Montana the right to water is a usufructuary right. Thus, an appropriator has the right to use water but does not outright own the water. Mont. Const. art. IX, § 3(3); Quigley, 110 Mont. at 505, 103 P.2d at 1072. At various times the Montana legislature has enacted and then revised the statutory requirements for appropriators to follow in order to perfect water rights. In addition to the requirements involving beneficial use, a delineated place of use has historically been necessary for perfection, even prior to its necessity by statute. Quigley, 110 Mont. at 505, 103 P.2d at 1072.
¶41 The appurtenance of water to land is a general water rule in Montana.[5] Smith v. Denniff, 24 Mont. 20, 23-24, 60 P. 398, 399-400 (1900). Typically an appropriator applies appropriated water to his own land, thus unifying the water right and the title to the land. Other water-appropriating entities, such as irrigation districts, state water projects, and private corporations, also may own water rights, but at the same time it is possible they do not own the land upon which the water is put to use. These entities define the relationship between the *108 water right owner and the water user in their organization’s documents (i.e. bylaws, contracts, shares of stock, etc.).
¶42 In regard to water projects organized under the Carey Land Act, Bruffey summarized the purpose of appurtenance provisions found in the Carey Land Act’s statutory language and operating companies’ organizational documents, like the one found in Pondera’s bylaws. In Bruffey we stated:
[T]he purpose of making the water right appurtenant to the land and inseparable therefrom was to enable the construction company to retain an enforceable lien on both the land and water right, and that after the lien is satisfied the water right may be transferred to other lands with the same freedom that water rights generally may be transferred, so long as the rights of others are not adversely affected.
Bruffey, 137 Mont. at 345, 351 P.2d at 609. It was necessary to tie the water right to the land because under the statutory arrangement the construction company, which constructed the water infrastructure at the behest of the State, was to turn over the ownership of the system to the operating company upon completion of the system and at 90% sale of stock. Valier Co., 123 Mont. at 332, 215 P.2d at 968. The construction company itself neither owned the land nor the water right but had considerable investment in the proj ect by way of the hardware. Intertwining the water right and landownership in this way helped to ensure the construction company would receive payment for its role in the project.
¶43 Here, Pondera’s stock provisions specifically contemplate the movement of water within the project’s boundaries. Likewise, the specifics of the Carey Land Act support the idea of water movement. Further, as explained in Bruffey, the appurtenance of water was an important tool to help ensure the success of the project as a whole. The share of stock, once issued, ties the right to water to the land upon which the water is to be used as described in the certificate. However, an unissued or reclaimed share of stock still holds a measure of a perfected right to water, but will have no appurtenant attached land. Thus, a strict requirement of appurtenance in this type of water right developed under the Carey Land Act cannot be followed.
¶44 Looking to the intent of the project under the Carey Land laws, the purpose of the arrangement was to bring water to the lands identified by the MCLB as irrigable within the project. As described in the Master’s report, one given share of stock may be attached to more land than one irrigable acre. The landowner then would have the option of selecting which portion of his land to actually irrigate. *109 However, it is Pondera who remained the owner of the water right, not the landowner; the landowner is merely the conduit for beneficial use. Aberdeen-Springfield Canal Co., 982 P.2d at 921; Twin Falls Salmon River Land & Water Co. v. Caldwell, 266 U.S. 85, 45 S. Ct. 22 (1924). Curry cites Schwend and Adams v. Chilcott, 182 Mont. 511, 597 P.2d 1140 (1979) for the proposition that water rights transfer with the sale of land. While this proposition is correct, Schwend and Adams do not apply here. In the event a landowner with stock in Pondera sells his land his water use-right via Pondera transfers to the new ownership, unless specifically reserved. But, this does not mean the right is tied indelibly to the land itself; the right is tied to the issuance of stock by Pondera for use upon land as determined irrigable within the project. The water right ownership and the land ownership remain distinct even if there is a substantial likelihood they will remain together. If a shareholder fails to properly abide by his contractual payment obligations to Pondera for the continued use of the water right, then Pondera would be able to follow its corporate procedures to recall the share. In this situation the water right would remain with the company, never with the shareholder even though the water itself is not being used at that moment in time. Therefore, in a Carey-Land-Act context the individual stock certificates’ appurtenant land should not define the overall water right’s place of use.
B. Service Area
¶45 We now turn to the issue, as the parties have framed it, of a service area as opposed to a historical place of use. At the outset we note, along with the Water Court, that the rights discussed herein in regard to the service area are those that Pondera acquired prior to the WUA. The rights acquired after the WUA are subject to use within their historic places of use. As previously stated, where water is put to use is an element of a water right. Quigley, 110 Mont. at 505, 103 P.2d at 1072. Under statute a statement of claim for an existing water right is prima facie proof of its contents. Section 85-2-227( 1), MCA. This may be overcome if an objector proves, by a preponderance of the evidence, that the claim does not accurately reflect the water right as it existed prior to the WUA. Nelson v. Brooks, 2014 MT 120, ¶ 37, 375 Mont. 86, 329 P.3d 558 (quoting W. R. Adj. R. 19).
¶46 Bailey again is instructive in this discussion.
There may be lands available for irrigation at the time the corporation’s system is completed; but the corporation cannot compel people to utilize their lands, and, if they do, it cannot compel them to use its water. If the appropriation is not completed until the water is actually used, it is apparent at once that the *110 corporation’s right, if any it has, is so intangible and uncertain as to be of no value, whatever amount of money may have been expended on the work. If the land sought to be reclaimed should be government land, the corporation would be confronted with the additional difficulty that it cannot compel people to settle upon such lands, and its appropriation would depend upon the tide of immigration and the wishes of the settlers when they do come in, if use is necessary to complete the appropriation.
Bailey, 45 Mont. at 176, 122 P. at 583. While Bailey certainly does not contemplate removing all limitations to a water right secured under the Carey Land Act method, it highlights the need for prospectivity in such a development project. Over time the project was modified to adapt to a size in relation to the amount of water available as determined by the MCLB, amongst other factors. Similar to Bailey where the operating company acquired the rights of the original appropriators who sought to develop a distribution system, Pondera’s predecessors likewise intended to distribute water for irrigation sale. Both in this case and in Bailey the water distribution companies ultimately availed themselves of the Carey Land Act, which is an explicit federal and state statutory construct to settle and bring water to arid land. The water rights developed in this manner were perfected upon the completion of the water distribution system, and thus deemed to satisfy the beneficial use requirement at that time. Bailey, 45 Mont. at 170-171, 122 P. at 580-581. This contrasts to a typical use or filed right where the beneficial use is the actual, in-fact use of the water.
¶47 As previously discussed, because beneficial use occurs prior to the application of the water on the land, the right cannot be constrained by the actual use of the water, nor can it be indelibly constrained by the exact land upon which the water is put to ultimate use. Aberdeen-Springfield Canal Co., 982 P.2d at 922. The rights developed for future sale have their place of use determined by the lands irrigable under the system when it was completed. The prospectivity necessary in such a project, and recognized in Bailey, is still subject to limitations. While we recognize the intent of the specific statutory method of acquiring these water rights provides for flexibility, we concurrently recognize they are still subject to principles of Montana water law. Water rights like these at issue may ‘Toe transferred to other lands with the same freedom that water rights generally may be transferred, so long as the rights of others are not adversely affected.” Bruffey, 137 Mont. at 345, 351 P.2d at 609.
¶48 Based on the reasons outlined above, we therefore hold the *111 idea of a service area is the proper method of satisfying the place-of-nse requirement in the context of Carey Land Act projects. The boundaries of the service area are then subject to the project as it was developed and completed, and by the lands identified by the MCLB, as well as the fundamental tenets of water law in this state.
C. Boundaries of the Service Area
¶49 Because we agree with the court’s determination that a service area is the appropriate method to define a place of use for a Carey Land Act project, we review its factual determination of the boundary for clear error. Pursuant to the Water Rights Claim Examination Rules, Pondera filed these claims on an irrigation district claim form. The record shows Pondera originally used Township and Range to describe its service area. In 2007, Pondera apparently sought to amend its service area to the 377,255.5-acre figure that Curry now contests.[6] The Water Court found that the project’s boundaries have remained largely unchanged since its completion. The court further found the service area acreage amount as of 2007 was based on the DNRC’s review of Pondera’s claims. The court stated because it determined Pondera was entitled to claim a service area, and Curry was unable to produce evidence to refute the area’s bounds, it accepted Pondera’s service area of 377,255.5 acres. The court evaluated the evidence presented before it, and based on the substance of the evidence determined the acreage amount appropriately described the area of lands under the project. We hold the court did not commit clear error.
¶50 The Water Court stated in its order:
The [c]ourt recognizes that the service area is large relative to the amount of historic irrigation within the service area. It is possible that a smaller service area could have been defined with better evidence. Given that this proceeding is a certification action and not a final determination of the water rights at issue, and given that claims and amendments thereto are afforded prima facie status by statute, the service area described in this order is sufficient to address the Water Court’s obligations under § 85-2-406, MCA.
Similarly, while we agree a service area is the proper method of defining the place of use for the water rights developed under the Carey Land Act, we do not definitively determine the size of the service *112 area in this Opinion and at this stage in the adjudication process. Merely, we agree with the Water Court that the 377,255.5 acres described as the service area will be sufficient for the purposes of its certification order, less our ruling below in regard to Issue three.
¶51 3. Did the Water Court err by ruling Pondera’s storage rights were beneficially used on the Birch Creek Flats prior to 1973?
¶52 The Master found the water used on the Flats was non-Pondera water prior to the implementation of the WUAin 1973. The Master did note, however, at times Curry and other non-Pondera users would call upon Pondera to honor what they believed to be their senior water rights. The record indicates the parties have disputed the priority of their rights, and for a long period of time essentially agreed to disagree as to seniority. However, Pondera would from time to time accommodate and respond to the non-Pondera water users irrigating on the Flats and release water from its storage facilities that would eventually flow into the canals utilized by the non-Pondera water users on the Flats. The Master found this release of water to the Flats did not amount to historical water use by Pondera in the area of the Flats, but instead was equivalent to the action of a junior water right holder responding to the call of a senior. According to the Master, such a response by Pondera maintained the status quo in the region and allowed the water users to irrigate relatively harmoniously.
¶53 Conversely, the Water Court found the evidence of the travel of some Pondera water to the Flats to indicate historic water use by Pondera on the Flats. It concluded the Flats should be considered within the bounds of the service area because the Flats can be reached by Pondera’s system.
¶54 The Flats area is within the boundary of the service area as currently claimed by Pondera. Both the Water Court and the Master appear to evaluate the issue based on the acts of the irrigators on the Flats. Because we have determined beneficial use in the context of this case is decided not by the acts of the irrigators themselves but by the company through its issuance of shares, we must likewise evaluate the beneficial water use on the Flats by the acts of Pondera. Based on various testimonies it appears the water itself was discharged to irrigators on the Flats. However, it is clear that Pondera’s definite water rights in the Flats area were acquired after July 1, 1973.
¶55 To exclude the Flats from the service area the prima facie status of Pondera’s claim must be overcome by a preponderance of the evidence. Section 85-2-227(1), MCA. In the event the Flats were originally included in the project Pondera can nonetheless lose its right to the area due to nonuse or abandonment. Bailey, 45 Mont. at 178, 122 *113 P. at 583. While the Master anchored his analysis in the irrigators’ beneficial water use, which we reject, we agree with his general outline of the evidence in regard to Pondera’s interaction with users on the Flats, as presented at this stage in the adjudication process. In regard to the Flats, the Master found the evidence supported the following findings: “all of the water use on the Flats before 1973 was non[Pondera]”; Pondera “accommodated its neighbors, at times ... effectively honoring their senior rights”; and as quoted from an MCLB report “[Pondera] was ‘inclined to satisfy [non-shareholder water users] in every way possible to prevent controversies over these rights.’ ” Further, a report generated by Pondera’s predecessor stated the Flats were actually not included in the project.
¶56 To summarize, while there is some evidence of water use by irrigators on the Flats, there is more evidence to support that the Flats were either not included in the project or Pondera’s lack of issuance of stock to water users on the Flats prior to 1973 equates to nonuse in the area. We cannot agree that the Water Court’s legal conclusion that water was beneficially used on the Flats prior to 1973 is correct. Instead, we find Curry met his burden of proof. Therefore, the Water Court’s order regarding the inclusion of the Flats in the service area is reversed. We remand to the court to remove the inclusion of the Flats from the service area and to retabulate the bounds of the service area to the extent the removal of the Flats affects the acreage assessment.
¶57 4. Did the Water Court err by substituting its judgment for the trier of fact in regard to Claim Nos. 41M 162000-00 and 41M 162109-00 (Gray Right), and Claim No. 41M199797-00?
¶58 Curry argues the Water Court erroneously substituted its judgment for the trier of fact, the Water Master, when it increased the flow rate of the Gray Right from 0.95 cubic feet per second (cfs) to 5.67 cfs. Curry claims there is substantial evidence to support the Master’s finding in regard to the Gray Right. Curry also argues the court erred when it reversed the Master’s dismissal of Claim No. 41M 199797-00 because the Master found the right to be a duplicate of another right claim. Curry contends the court contradicted its determination that Claim No. 41M 199797-00 should be reinstated when during its analysis of other claims it found the right to be duplicative. In response to the Gray Right, Pondera argues the Master’s report contained contradictory findings regarding the flow rates for the rights. It contends the court properly evaluated the flow rate based on ditch capacity measurements.
¶59 A water right’s flow rate is a factual determination. Worden v. Alexander, 108 Mont. 208, 213, 90 P.2d 160, 162 (1939) (quoting Tucker *114 v. Missoula Light & Water Co., 77 Mont. 91, 108, 250 P. 11, 18 (1926)). The Master made a flow rate finding that was subsequently reversed by the court. We first review de novo whether the court correctly applied the appropriate standard of review. Heavirland, ¶ 15. Again, the Water Court is obliged to review the Master’s determination to see whether there is substantial evidence to support the factual findings. If there is substantial evidence the court may still determine the Master was in error if he misapprehended the effect of the evidence. Finally, even if there is substantial evidence and no misapprehension of the evidence, the court may still find clear error if upon viewing the evidence as a whole the court has a firm and definite opinion that a mistake has been made. Skelton Ranch, Inc., ¶ 27. We address the arguments in the order Curry has raised them.
A. Gray Right
¶60 Both the Master and the court effectively relied on the same report (the Atwood Report) as evidence to support their respective flow rate determinations. The Atwood Report made conflicting statements regarding the flow rate for this right. The Master found the flow rate to be 0.95 cfs based on the duty of water at the time, which is both a common water law assumption, and is also used in the Atwood Report in reference to this right. The court disagreed and stated the Gray Right, which was originally claimed as 12.5 cfs in the notice of appropriation, should be based on the ditch capacity of 5.67 cfs, which is also stated in the Atwood Report in reference to this right.
¶61 Curry argues first there is substantial evidence to support the Master’s findings, and second the court does not appropriately apply the applicable standard of review because it does not state whether substantial evidence supports the Master’s finding. While it would certainly be useful for the court to use the exact terminology found in the applicable standard of review, the court indeed discussed the substance of the Master’s findings regarding the Gray Right. The court indicated that while the Master’s determination that thé evidence showed a flow rate of 0.95 cfs, the Master misapprehended the effect of this evidence. Specifically, the Court stated it was “concerned about the use of a duty of water equivalent to one cfs for 80 acres” for this right. It further looked at the evidence regarding the general duty 0.95 cfs and ditch capacity 5.67 cfs, and found, in light of the latter’s accuracy and relationship to this specific right, ditch capacity more appropriately depicted the extent of the Gray Right. Again, while the court could have more clearly stated its rationale for overturning the Master’s decision, we hold it did in fact apply the appropriate standard of review.
*115 ¶62 Next, we turn to the court’s determination of 5.67 cfs. This substitute finding we review under the clearly erroneous standard. Skelton Ranch, Inc., ¶ 26. The evidence available regarding this right, the Atwood Report, makes two competing statements regarding the flow rate. Again, it states the ditch capacity was identified as 5.67 cfs at the time of the ditch’s completion. Yet also, it states the duty of water at that time was one cfs for 80 irrigable acres, a standard water assumption. Thus, based on the 76 irrigable acres under the right, the Atwood Report assumes a 0.95 cfs flow rate to further analyze the right. It does not, however, definitively note that 0.95 cfs was in fact used to irrigate. Further, as the court notes, ditch capacity, when it is available to be determined, is preferable to the standardized duty of water assumption. See McDonald, 220 Mont. 519, 722 P.2d 598. Therefore, based on the substance of the evidence regarding this right and in light of the evidence as a whole, we hold the court’s finding of 5.67 cfs for the Gray Right is not clearly erroneous.
B. Claim No. 41M 199797-00
¶63 The court’s finding that Claim No. 41M 199797-00 should not be dismissed because it was not duplicative is a legal conclusion that we review for correctness. Heavirland, ¶ 14; see also State v. Todd, 262 Mont. 108, 112, 863 P.2d 423, 425 (1993). The court properly set forth that a water claim is prima facie proof of its contents. Section 85-2-227(1), MCA. To overcome the prima facie proof, the burden of proof is upon the challenger to produce enough contrary evidence to meet the evidentiary standard of a preponderance of the evidence. Marks, ¶ 15. The court found the challenger, Curry, did not meet this burden of proof and the Master’s determination was not supported, thus the claim should not be dismissed. Upon review of the record, we agree with the court’s conclusion. Therefore, we affirm its decision to reverse the Master’s dismissal and reinstate Claim No. 41M 199797-00.
¶64 5. Should the Water Court’s tabulation for Claim Nos. 41M 131103-00 (Curry claim) and 41M199796-00 (Pondera claim) include volume measurements?
¶65 Pondera contends on cross-appeal that the tabulations for the Curry and Pondera claims should both include volume measurements. Pondera argues a volume determination would “greatly assist in the proper administration of water on Birch Creek by the district court and significantly lessen the chances of ongoing distribution disputes.”
¶66 In regard to volume determinations the WUA states, in part, a final decree must state the “flow rate and volume for rights that a water judge determines require both volume and flow rate to adequately administer the right.” Section 85-2-234(6)(b)(iii), MCA. The *116 decision by the Water Court to limit a water right by volume is a matter of discretion. Section 85-2-234(6)(b), MCA. While we recognize a volume determination may potentially be helpful to Pondera and the ultimate administration of these rights, we are aware of no Montana law, and Pondera has not provided us with any, that requires the Water Court to make a volume determination for these rights. Such a determination is in the purview of the Water Court and we will not substitute our judgment for the court’s judgment when it is not required by law. Therefore, the Water Court’s tabulation of these Curry and Pondera claims without a volume determination is affirmed.
CONCLUSION
¶67 In summary, we affirm the Water Court’s conclusion that Pondera’s rights are not limited by the shareholders’ actual historical acreage irrigated. We further affirm the Water Court’s conclusion that Pondera is entitled to a service area. However, we hold the Water Court erred when it determined the acreage included in the service area and we remand this issue to the court for further proceedings in accord with the discussion and decision under Issue 3.
¶68 With respect to Curry’s appeal and Pondera’s cross-appeal regarding the specific water rights, Issues 4 and 5, we hold the Water Court did not err in its determinations.
¶69 Affirmed in part; reversed in part; and remanded to the Water Court for further proceedings consistent with this Opinion.
CHIEF JUSTICE McGRATH, JUSTICES COTTER, BAKER, SHEA and RICE concur.

 See also Valier Co. v. State, 123 Mont. 329, 215 P.2d 966 (1950) for a discussion of the procedures of the Carey Land Act.

 While there was no volume determination made by the MCLB, Pondera has followed the issuance of 18 inches of water per acre of land, ultimately dependent on the availability of water for that season, and subject to change throughout the season.

 The implementation of the WUA, codified at Title 85, MCA, is significant because after this date all water users are required to comply with the Act for any changes made to a water right.

 Article III, Section 15 of the 1889 Montana Constitution states in part: “The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution or other beneficial use and the right of way over the lands of others, for all dithes [sic], drains, flumes, canals and acque-ducts, necessarily used in connection therewith, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use.”

 The current WUA requires the Water Court to state “the place of use and a description of the land, if any, to which the right is appurtenant” when issuing a final decree. Section 85-2-234(6)(e), MCA (2015) (emphasis added).

 Initially Pondera claimed a service area of 377,813.5 acres. The DNRC reviewed Pondera’s service area claim and was able to verify the currently-claimed number of 377,255.5 acres.