FILED

04/03/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0322

DA 16-0322

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 66

TETON COOPERATIVE RESERVOIR COMPANY,

      Claimant and Appellant,

LOWER TETON JOINT OBJECTORS,

      Objector and Appellee,

FARMERS COOPERATIVE CANAL CO. and
TETON COOPERATIVE CANAL COMPANY,

      Objectors, Appellees,
      and Cross-Appellants.

APPEAL FROM:    Montana Water Court, Case No. 41O-84
                    Honorable Douglas Ritter, Water Judge

COUNSEL OF RECORD:

        For Appellant:

        Holly Jo Franz, Ryan McLane, Franz & Driscoll, PLLP, Helena, Montana

        For Appellee Farmers Cooperative Canal Co.:

        Michael J.L. Cusick, Moore, O'Connell & Refling, PC,
        Bozeman, Montana

        For Appellee Teton Cooperative Canal Company:

        John E. Bloomquist, Bloomquist Law Firm, P.C., Helena, Montana

               Submitted on Briefs:  January 17, 2018
                         Decided:  April 3, 2018

Filed:

                              _____
                                    Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Teton Cooperative Reservoir Company (Teton Reservoir) appeals an April 27, 2016 order of the Montana Water Court in Case 41O-84, adjudicating Teton Reservoir's water rights. Teton Cooperative Canal Company (Teton Canal) and Farmers Cooperative Canal Company (Farmers) cross-appeal. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Whether the Water Court erred in determining that Teton Reservoir's 1902 Notice of Appropriation was valid.*

*Issue Two: Whether the Water Court erred by applying the equitable doctrine of laches to Teton Reservoir's 1902 Notice of Appropriation.*

*Issue Three: Whether the Water Court erred in decreeing Teton Reservoir an annual volume totaling 60,000 acre feet for storage in the Bynum Reservoir.*

*Issue Four: Whether the Water Court erred in refusing to limit Teton Reservoir's wintertime diversions to one-half of the available water in the Teton River.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Teton Reservoir is one of four irrigation companies located on the Teton River. Teton Reservoir was incorporated in May 1906, for the purposes of acquiring, developing, and improving the Bynum Reservoir and to complete one or more diversion canals to take water from the Teton River to the reservoir. Teton Reservoir has acquired four water rights. Teton Reservoir filed a Statement of Claim for each of its four water rights in the current water right adjudication process for the Teton River Basin. However, the only water right claim contested from the Water Court's Order is the claim based on the 1902 Notice of Appropriation (1902 Notice) filed by Donald Bradford (Bradford).

2

¶4     Bradford filed a Notice of Appropriation claiming 3,000 cfs from the Teton River on July 3, 1902. The stated purpose of the 1902 Notice was "for the purpose of irrigating and reclaiming lands lying in said Teton County." The 1902 Notice did not identify a reservoir. Shortly thereafter, Bradford commissioned a survey of the project. Engineer Walter Mathews (Mathews) performed the survey and on November 29, 1902, Mathews filed his survey report. Mathews identified a point of diversion, a reservoir with a 69,500 acre feet capacity, and surveyed over twenty-nine miles of distribution canals. Once Mathews's survey was approved by the Government Land Office (GLO), Bradford acquired the rights of way and tried to obtain funding for the project to develop a canal and reservoir system.

¶5     By 1906, Bradford was unable to obtain funding to develop the reservoir and canal system and conveyed the 1902 Notice and the rights of way to the Wagnild group. The Wagnild group incorporated Teton Reservoir in May 1906. Teton Reservoir obtained the funding to develop the Bynum reservoir and canal system (Bynum System). Between 1906 and 1909 construction on the Bynum System progressed. In 1907, the original diversion point was completed. In 1909, Teton Reservoir began to pursue a potential Carey Act project to acquire more land for irrigation.[1] Pursuing the Carey Act project led to internal conflict among Teton Reservoir's shareholders. Teton Reservoir's shareholders were in direct conflict with one another until 1914. Despite the internal

[1] The Carey Act was passed in 1894 by the federal government to promote settlement and irrigation of public lands in the West. Specifically, the Act provided a grant of up to one million acres of federal land to each western state "free of cost" if the State could cause such lands to be "irrigated, reclaimed, occupied and not less than twenty acres of each one hundred and sixty acre tract cultivated by actual settlers." 43 U.S.C. § 641.

3

conflicts, Teton Reservoir continued to make progress on the Bynum System. In 1910 and 1911, several engineers discovered problems with the design and construction of the dam that required resolving before Teton Reservoir could divert any water. By 1915, Teton Reservoir had relocated the diversion point because the original diversion point was in a poor location on the river, and it had resolved the dam's design problems. The 1962 Teton County Water Resource survey indicated that Strabane Gage Station started diverting floodwaters to the Bynum Reservoir in 1918.

¶6    In 1919, GLO Commissioner Tillman inspected the reservoir site and questioned the proposed Carey Act project. The Water Court found that the inspection marked a shift by Teton Reservoir to return to the original plan to develop the Bynum System and abandon the Carey Act project. Teton Reservoir's board officially abandoned the Carey Act project in 1925 by resolution. Due to Tillman's inspection, local irrigators began to promote formation of the Bynum Irrigation District (BID). In 1920, BID was established. The BID commissioned an engineer to evaluate the status of the Bynum System. Engineer S.B. Robbins issued his report on November 10, 1920, providing recommendations to improve the Bynum System so that it could divert and store water to its fullest capacity. However, BID could not finish the Bynum System until it received approval to sell bonds. Between 1920 and 1925, Teton Reservoir maintained the Bynum System. In 1925, BID received approval to sell bonds, bought eighty percent of Teton Reservoir's stock, and began implementing Engineer Robbin's recommendations. By 1927, Teton Reservoir's current point of diversion, intake canal, reservoir, and distribution canals were in place. When completed, the Teton Reservoir's diversion canal

capacity was 1,000 cfs and the Bynum Reservoir had a capacity between 85,000 and 90,000 acre feet.[2]

¶7    During that period, Teton Canal developed limited water storage in the Glendora Reservoir under its 1890 Notice of Appropriation. *Teton Coop. Canal Co. v. Teton Coop. Reservoir Co.*, 2015 MT 344, 382 Mont. 1, 365 P.3d 442 (hereinafter *Teton Canal I*). In 1936, Teton Canal expanded its water storage capacity with the development of the Eureka Reservoir. Teton Canal again expanded the Eureka Reservoir in 1947 and 1957. *Teton Canal I*, ¶ 14. In 2015, this Court determined that the Eureka Reservoir use could not relate back to Teton Canal's 1890 Notice and must be given a separate priority date. *Teton Canal I*, ¶¶ 55, 57. We affirmed the Water Court's determination that the priority date for the Eureka Reservoir is December 7, 1936. *Teton Coop. Canal Co. v. Teton Coop. Reservoir Co.*, 2018 MT 20, ¶ 17, 390 Mont. 210, ___ P.3d ___.

¶8    In 1908, the District Court issued a decree adjudicating water rights on the upper Teton River. *Perry v. Beattie*, Case No. 371 (Mont. 11th Judicial Dist., March 28, 1908) (hereinafter *Perry* decree). The *Perry* decree adjudicated Teton Canal's predecessors' and Farmers' predecessors' water rights. Teton Reservoir was not a party to the *Perry* decree.[3] Significantly, Teton Reservoir never sought to reopen the *Perry* decree to establish its water rights in relation to other appropriators.

---

[2] The 1902 Notice claimed 3,000 cfs. However, Teton Reservoir only claimed 1,000 cfs for its claim, 41O 113433-00.

[3] The Water Court speculated that Teton Reservoir's predecessor was not a party to the *Perry* decree because Teton Reservoir was not diverting any water by 1908.

¶9 Historically, Teton Reservoir's water rights have been administered by the water commissioner appointed by the District Court to distribute water under the *Perry* decree. In 1946, the water commissioner refused to turn water into Teton Reservoir's ditch, and Teton Reservoir passed a resolution instructing the directors to take steps to clarify Teton Reservoir's water rights. However, the Water Court found no evidence indicating that effort had been undertaken. In 1952, the water commissioner again shut off Teton Reservoir's water diversion to provide water to Farmers. Teton Reservoir objected but did not file a formal dissatisfied water user complaint. Teton Reservoir, Farmers, and the water commissioner met with the District Court to discuss the administration of water. In 1953, the District Court directed the water commissioner to continue delivering the total decreed right to Farmers before Teton Reservoir. Teton Reservoir did not dispute the District Court's direction.

¶10 In 2006, for the first time, Teton Reservoir filed formal objections to Teton Canal's water right claims. The objection asserted that the Eureka Reservoir use could not relate back to Teton Canal's 1890 Notice. In 2009, Teton Reservoir filed a Dissatisfied Water User Complaint in District Court because Water Commissioner Leonard Blixrud reduced Teton Reservoir's flow to half the available flow in the Teton River. Teton Reservoir alleged that the water commissioner did not have the authority to administer Teton Reservoir's water rights as they were not part of the *Perry* decree. Teton Reservoir sought injunctive relief to restrain the water commissioner from interfering with its diversions. On September 21, 2009, the District Court resolved Teton Reservoir's Dissatisfied User Complaint, finding that Teton Reservoir had voluntarily

6

participated in the administration of the *Perry* decree for nearly forty-seven years and it was judicially estopped from asserting otherwise.

¶11 Specifically, the District Court determined:

[Teton Reservoir] has known since the first appointment of a water commissioner over 47 years ago, that is was not a decreed water user under the *Perry v. Beattie* decree. [Teton Reservoir] has maintained its position of participating with the decree's administration for the past 47 years. Water reports of [Teton Reservoir's] water usage since 1964 have been filed in these legal proceedings; [Teton Reservoir] has paid the water commissioner since 1964 for its water; and [Teton Reservoir] has benefited from consistent management by a water commissioner of [Teton Reservoir's] water for the past 47 years. . . . Lastly, to allow [Teton Reservoir] to change its position would disrupt the orderliness and consistency of water distribution along the Teton River. [Teton Reservoir] is the largest off stream reservoir on the Teton. [Teton Reservoir's] reservoir, Bynum, has a holding capacity of 90,000 acre feet of water. [Teton Reservoir] seeks annually to fill Bynum to capacity. Other storage appropriators such as Farmers' and [Teton Canal] store water and rely on distribution of water during the non-irrigation season as well. To allow an unregulated upstream diversion to [Teton Reservoir's] reservoir would be injurious to these other storage rights and decreed users downstream who have come to rely on the water commissioner's control and regulation of [Teton Reservoir's] water usage.

However, the District Court recognized that "the significance of prior history and usage set forth in the depositions of Judge McPhillips and Commissioner Bud Olson will be for the Montana Water Court and not this Court to decide" and "this Court has no authority to decrease a water right in order to avoid a cessation of in-stream flow."[4]

---

[4] By statute, the water court is vested with exclusive jurisdiction relative to all matters relating to the determination of existing water rights within the boundaries of the State of Montana. Section 3-7-501, MCA; *Baker Ditch Co. v. District Court,* 251 Mont. 251, 255, 824 P.2d 260, 260 (1992). District courts are granted the authority to supervise the distribution of water that has already been adjudicated and to enforce such water decrees. *See § 85-2-406(3),* MCA. The district court is bound by the existing water right decrees. *Baker Ditch Co.,* 251 Mont. at 255, 824 P.2d at 260.

¶12 Beginning on December 10, 2012, the Water Court held a four-day hearing to adjudicate Teton Reservoir's water rights. Bud Olson, who served as the water commissioner from 1962 to 2000, testified that he consistently delivered water to Teton Reservoir even though it was not a part of the *Perry* decree. Olson treated Farmers and Teton Canal as senior to Teton Reservoir for all water deliveries. Olson further testified that he would limit Teton Reservoir's wintertime diversions based on requests of the Department of Montana Fish, Wildlife, and Parks (the Department) for instream flow. Olson noted that the request by the Department was one he chose to respect and was not dictated by any decreed water right.

¶13 Subsequent water commissioners followed Olson's policy of treating Teton Reservoir as junior to those rights in the *Perry* decree. Leonard Blixrud, a former Farmers officer, board member, and water commissioner followed Olson's policy. Blixrud testified that: (1) Teton Reservoir's water was administered as junior to Farmers and Teton Canal, (2) if Teton Reservoir's 1902 Notice had senior priority it would take everything in the river and effectively "destroy" Farmers and seriously impact Teton Canal, and (3) Farmers and Teton Canal shareholders rely on Teton Reservoir's water being administered as a junior right to obtain enough irrigation water to stay in business.

¶14 Teton Canal shareholder Charles Crane also opposed giving Teton Reservoir's 1902 Notice senior priority. Crane testified that stored water in the Eureka Reservoir allows Teton Canal shareholders to irrigate late into the growing season when its priority is out of date, and that without the stored water in the Eureka Reservoir, Teton Canal would be out of water by July 1st most years. He asserted that changing past practice

8

would have a serious impact on the ability of Teton Canal and its shareholders to meet their financial obligations.

¶15 BID president and Teton Reservoir board member Mark DeBruycker testified regarding Bynum Reservoir's volume. DeBruycker stated that Teton Reservoir estimates total available volume each year and limits the annual allotment to fifty percent of the available water. DeBruycker testified a full allotment requires diverting 40,000 acre feet. DeBruycker indicated that Teton Reservoir's practice favors carryover water for the next year rather than increasing the allotment to its shareholders because of the uncertainty of available flow from year to year.

¶16 The Teton River water commissioner records and Teton Reservoir's table of reservoir levels provide limited historical information on Teton Reservoir's diverted volume to the Bynum Reservoir. However, the 1962 Teton County Water Resources Survey stated that the "average annual storage is 75,000 acre feet with a drawdown of about 35,000 to 40,000 acre feet of water used during the irrigation season." Upon examination of these records along with DeBruycker's testimony, the Water Court found that Teton Reservoir diverted as much water as possible when it was available. The Water Court determined that Teton Reservoir had two goals: (1) provide its shareholders full allotment, and (2) store sufficient carryover water for the following year.

¶17 John Peebles also testified regarding the flow amount Teton Reservoir diverts during wintertime. John Peebles owns property downstream from Teton Reservoir's point of diversion. He testified that Teton Reservoir often takes the entire flow of the

9

river during its wintertime diversions. The Water Court noted the November 1985 water commissioner's record also indicated that Teton Reservoir was getting the entire flow.

¶18 After the four-day hearing, the Water Court issued an Order on April 27, 2016. The Water Court concluded: (1) Teton Reservoir is barred by laches from claiming senior priority of its 1902 Notice; (2) Teton Reservoir's 1902 Notice complied with the 1885 Montana Appropriation Act; (3) Teton Reservoir is entitled to a 60,000 acre feet volume limit on its 1902 Notice for the Bynum Reservoir; and (4) Teton Reservoir is not restricted to one-half of the available flow in the Teton River during its wintertime diversions.

## STANDARD OF REVIEW

¶19 This Court reviews the Water Court's decisions using the same standards applied to district court decisions. *Teton Coop. Reservoir Co. v. Farmers Coop. Canal Co.*, 2015 MT 208, ¶ 9, 380 Mont. 146, 354 P.3d 579. We review the Water Court's findings of fact to determine if they are clearly erroneous. *Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 26, 375 Mont. 327, 328 P.3d 644. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if after reviewing the entire record this Court is left with the definite and firm conviction that a mistake was committed. *Skelton Ranch, Inc.*, ¶ 27. Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion, even if the evidence is weak or conflicting. It need not amount to a preponderance of the evidence, but it must be more than a scintilla." *Skelton Ranch, Inc.*, ¶ 27. We review the Water Court's conclusions of law to determine if they

10

are correct. *Skelton Ranch, Inc.*, ¶ 26; *Wicklund v. Sundheim*, 2016 MT 62, ¶ 9, 383 Mont. 1, 367 P.3d 406.

## DISCUSSION

¶20 *Issue One: Whether the Water Court erred in determining that Teton Reservoir's 1902 Notice of Appropriation was valid.*

¶21 A properly filed statement of claim for an existing water right "constitutes prima facie proof of its content . . . ." Section 85-2-227(1), MCA; W. R. Adj. R. 19. This prima facie validity may be overcome if the objector "prove[s] by a preponderance of the evidence that the elements of the original claim 'do not accurately reflect the beneficial use of the water right as it existed prior to July 1, 1973.'" *Nelson v. Brooks*, 2014 MT 120, ¶ 37, 375 Mont. 86, 329 P.3d 558 (quoting W. R. Adj. R. 19). Teton Reservoir properly filed its statement of claim for existing water rights; accordingly, the claim serves as prima facie evidence that the information contained in it is true. Section 85-2-227(1), MCA; W. R. Adj. R. 19. Therefore, Teton Canal and Farmers had the "burden to show by a preponderance of the evidence that the information in the claim is incorrect." *Marks v. 71 Ranch, Ltd. P'ship*, 2014 MT 250, ¶ 16, 376 Mont. 340, 334 P.3d 373 (citations omitted).

¶22 In its cross-appeal, Teton Canal argues that Teton Reservoir's 1902 Notice failed to comply with Montana's 1885 Appropriation Act (1885 Act). Teton Canal argues that the 1902 Notice had several fatal flaws, including: (1) the place of intended use description was vague; (2) it failed to identify a reservoir; (3) Bradford's intent was

11

speculative when filed; and (4) it failed to construct the canal and reservoir system with reasonable diligence.

¶23     Teton Reservoir argues that the 1902 Notice complied with Montana's 1885 Act. More specifically, Teton Reservoir contends that the 1885 Act does not require a specific place of use description or require identification of a storage reservoir. Teton Reservoir further maintains that under the 1902 Notice it exercised reasonable diligence in constructing the Bynum System in compliance with the statute.

¶24     The 1885 Act required a notice of appropriation to state the quantity of claimed water and the purpose of claimed water, as well as the place of intended use, means of diversion, date of appropriation, name of appropriator, name of stream, and an accurate description of point of diversion. Section 89-810, RCM (1947) (repealed 1973). When filing a notice of appropriation, "the claimant must have an intention to apply the water to a useful or beneficial purpose." *Bailey v. Tintinger*, 45 Mont. 154, 178, 122 P. 575, 583 (1912). An appropriator's intent must be determined by acts and surrounding circumstances at the time of the appropriation. *Wheat v. Cameron*, 64 Mont. 494, 501, 210 P. 761, 763 (1922). Under the 1885 Act, Teton Reservoir's 1902 Notice could not "ripen into a valid appropriation until the . . . statutory requirements for a completed appropriation [were] met." *Montana Dep't of Natural Resources & Conservation v. Intake Water Co.*, 171 Mont. 416, 431, 558 P.2d 1110, 1118 (1976). Section 89-811, RCM (1947) (repealed 1973), provided that an appropriator has a valid appropriation if the appropriator "proceeds to prosecute the excavation or construction of the work by which the water appropriated is to be diverted." In *Intake*, we interpreted § 89-811,

12

RCM, concluding that an appropriator is not required to commence "actual on-site excavation or construction of the diversion works" to preserve its priority date, but the appropriator must demonstrate that it made a "steady on-going effort in good faith . . . to prosecute the construction of the project under the circumstances." *Intake*, 171 Mont. at 436, 558 P.2d at 1121; *Teton Canal I*, ¶ 45.

¶25 Teton Canal argues that the place of intended use and omission to identify a reservoir invalidated Teton Reservoir's 1902 Notice. The 1902 Notice claimed 3,000 cfs from the Teton River "for the purposes of irrigation and reclaiming lands by lying in said Teton County." The 1902 Notice identified the intended place of use as Teton County. There was no statutory requirement that the intended place of use description had to include a specific land description. The Water Court found that diverting 3,000 cfs would require irrigating a large area and therefore the description of "Teton County" was sufficient. The Water Court correctly determined that the 1902 Notice's intended place of use was sufficient. Further, the statutory requirement for a valid notice of appropriation did not require that an appropriator identify a specific reservoir at the time of filing of a water right.[5] The Water Court correctly determined failure to identify a reservoir in the notice of appropriation did not invalidate Teton Reservoir's 1902 Notice.

¶26 Teton Canal also asserts that Bradford's intent at the time of filing was speculative. The record reflects that when Bradford filed the 1902 Notice he intended to

---

[5] Storage in a reservoir may be added after a notice of appropriation is filed to an existing direct flow water right as long as addition of storage does not interfere with the rights of other appropriators. *See Whitcomb v. Helena Water Works Co.*, 151 Mont. 443, 449, 444 P.2d 301, 304 (1968).

13

develop a large water diversion and storage system for the purpose of "irrigating and reclaiming lands in Teton County." Upon filing the 1902 Notice, Bradford commissioned a survey by Mathews. Mathews filed his report with the GLO on November 29, 1902. The report and survey provided details for the project Bradford intended to develop. Mathews's report included a survey of a reservoir with a capacity of 69,500 acre feet and twenty-nine miles of distribution canals. Additionally, in 1903, Bradford acquired the rights of way for the Bynum System from the GLO. Bradford's acts and surrounding circumstances at the appropriation show his intent to create a large diversion and reservoir system for the purpose of irrigation in Teton County. The Water Court correctly determined that Bradford showed intent to develop a large diversion and reservoir system under the 1902 Notice and planned to put such water to beneficial use.

¶27 Finally, Teton Canal argues that the Bynum System was not prosecuted with due diligence under the 1902 Notice. Bradford filed his Notice of Appropriation on July 3, 1902. Between July 3, 1902, and 1906, Bradford commissioned a survey, acquired the rights of way, and tried to obtain funding for the project to develop the Bynum System. In 1906, the 1902 Notice and all of the rights of way were conveyed to Teton Reservoir. From 1906 to 1909, Teton Reservoir progressed with the construction of the Bynum System, including completing the original point of diversion.

¶28 In 1910 and 1911, engineers discovered problems with the design and construction of the Bynum Reservoir's dam, which required repairs before water could be stored. The Water Court found that Teton Reservoir resolved these issues by 1915. Additionally, in 1915, Teton Reservoir relocated the point of diversion. The Water Court found that the

14

Bynum System was sufficiently developed by 1915 to divert some water, store that water, and deliver it to irrigators. In 1918, Teton Reservoir began diverting floodwaters into the Bynum Reservoir.

¶29 In 1920, an engineer was hired to assess the current status of the Bynum System. The engineer documented Teton Reservoir's ongoing issues with the headgate, intake canal, and dam. He made recommendations to improve the system. Between 1920 and 1925, Teton Reservoir maintained the Bynum System until it could finish the project. By 1925, BID received approval to sell its bonds and began improving the Bynum System. In 1927, Teton Reservoir's current point of diversion, intake canal, reservoir and distribution canals were completed.

¶30 The record reflects that Teton Reservoir made steady on-going efforts to prosecute the construction and development of the Bynum System. The evidence shows that after filing the 1902 Notice, Teton Reservoir's predecessors continued to develop the Bynum System despite construction and design issues and lawsuits until 1927. Although the evidence shows that the Bynum System was sufficiently developed by 1915 to divert some water, any water delivery "constitute[d] a fraction of the eventual capacity of the [Teton Reservoir's] system." The evidence further shows that after 1915, Teton Reservoir continued to develop and improve the Bynum System until the system was completed in 1927. Upon completion, the Bynum System could divert and store water to its fullest capacity as contemplated by the 1902 Notice. Based on the evidence, we conclude that Teton Reservoir sufficiently prosecuted the construction of the Bynum System with due diligence until its completion in 1927. Thus, Teton Reservoir complied

15

with § 89-811, RCM (1947) (repealed 1973). The Water Court correctly concluded that the 1902 Notice was a valid appropriation under the 1885 Act.

¶31 *Issue Two: Whether the Water Court erred by applying the equitable doctrine of laches to Teton Reservoir's 1902 Notice of Appropriation.*

¶32 Teton Reservoir argues on appeal that the Water Court erred in determining that it is barred by laches from asserting its senior priority date over Teton Canal. Teton Reservoir contends that it was entitled to presume the water commissioners were properly distributing water according to priority and had no duty to reopen the *Perry* decree. Teton Reservoir further maintains that the Water Court erred when it relied on Teton Canal's conclusory statements showing prejudice.

¶33 Laches is an equitable remedy that can apply when a person is negligent in asserting a right. *Cole v. State ex rel. Brown*, 2002 MT 32, ¶ 24, 308 Mont. 265, 42 P.3d 760 (citations omitted). Laches exists "where there has been an unexplainable delay of such duration or character as to render the enforcement of an asserted right inequitable, and is appropriate when a party is actually or presumptively aware of his rights but fails to act." *Cole*, ¶ 24 (quoting *Larson v. Undem*, 246 Mont. 336, 340, 805 P.2d 1318, 1321 (1990). Laches is not a mere matter of elapsed time, but rather, it is principally a question of the inequity of permitting a claim to be enforced. *Cole*, ¶ 25 (citing *Hunter v. Rosebud Cnty.*, 240 Mont. 194, 199, 783 P.2d 927, 930 (1989).

¶34 Laches applies only if the court finds lack of diligence by the party against whom the defense is asserted and prejudice to the party asserting the defense. *Wicklund*, ¶ 40 (internal citations omitted). Lack of diligence may be demonstrated when a claimant

contemporaneously believes another is violating his or her right, yet the claimant allows the alleged unlawful act to continue without objection. *Algee v. Hren*, 2016 MT 166, ¶ 9, 384 Mont. 93, 375 P.3d 386. A party is held to be presumptively aware of his rights where the circumstances of which he is cognizant are such as to put a person of ordinary prudence on inquiry. *Cole*, ¶ 24. A party asserting laches must provide evidence, more than conclusory statements, to prove prejudice. *Anderson v. Stokes*, 2007 MT 166, ¶¶ 20-21, 338 Mont. 118, 163 P.3d 1273.

¶35    In this case, the Water Court found that Teton Reservoir failed to assert its senior priority water right to the prejudice of Teton Canal. This lack of diligence can be traced to 1936, the year that Teton Canal developed the Eureka Reservoir. Teton Reservoir was aware of Teton Canal's development of the Eureka Reservoir and that the Eureka Reservoir would provide additional water storage not previously available to Teton Canal. Teton Canal began storing water in the Eureka Reservoir in 1937. Teton Reservoir was further aware of Teton Canal's expansions of the Eureka Reservoir in 1947 and 1957. However, at no point, until objections were filed in 2006, did Teton Reservoir contend that Teton Canal's storage right in the Eureka Reservoir was junior to its 1902 Notice.

¶36    Moreover, Teton Reservoir knew its 1902 Notice was not adjudicated in the *Perry* decree in 1908. Teton Reservoir allowed the *Perry* decree to control the administration of its water rights despite not being a party to the decree. In 1946 and 1952, Teton Reservoir took issue with the water commissioner's administration of its water right, yet remained silent despite passing an internal resolution to clarify its water rights. Teton

17

Reservoir could have filed a petition to reopen the *Perry* decree to establish its rights regarding the 1902 Notice but decided against it.[6] Teton Reservoir allowed the *Perry* decree to control its diversions of water from the Teton River since at least 1940 despite knowing that its water rights were not adjudicated in the *Perry* decree. Thus, Teton Reservoir failed to diligently assert it had a senior priority water right.

¶37 For nearly seventy years, Teton Reservoir acquiesced in the water commissioners' administration, knowingly allowing Teton Canal to store water with a junior priority water right. The Water Court correctly concluded that Teton Reservoir's delay in bringing a claim for a senior priority right against Teton Canal constituted an unexplainable delay and was of such character as to render enforcement of its newly asserted right inequitable.

¶38 The Water Court also determined that enforcing Teton Reservoir's senior priority water right would be prejudicial to Teton Canal. The water commissioners administered water based on the *Perry* decree for nearly seventy years. Finally, in 2009, Teton Reservoir did challenge the authority of the water commissioner to administer water at its headgate. In the 2009 ruling on Teton Reservoir's Dissatisfied Water User Complaint, the District Court held:

> [S]torage appropriators such as Farmers' and [Teton Canal] store water and rely on distribution of water during the non-irrigation season as well. To allow an unregulated upstream diversion to [Teton Reservoir's] reservoir would be injurious to these other storage rights and decreed users

---

[6] Section 89-835, RCM (1947) (repealed 1973), provided that any time after the entry of a decree, any person who had or claimed a valid water right, prior to the entry of the decree, may petition the court which entered the previous decree for an order making him a party to such decree and establishing his right.

> downstream who have come to rely on the water commissioner's control and regulation of [Teton Reservoir's] water usage.

The Water Court determined that Teton Canal would be injured because it has come to rely on the water commissioner's administration of Teton Reservoir's 1902 Notice as junior to the *Perry* decreed rights.

¶39 Teton Reservoir argues that the Water Court relied on conclusory statements to find prejudice. However, the record supports that allowing Teton Reservoir to assert its senior priority would be injurious to Teton Canal. Teton Reservoir's reservoir, Bynum, is the largest off-stream reservoir of the Teton River. Teton Reservoir has a maximum holding capacity of 90,000 acre feet. In comparison, Teton Canal's Eureka Reservoir has a maximum holding capacity of 5,500 acre feet. *Teton Canal I*, ¶ 14. The testimony of Blixrud and Crane asserted that allowing Teton Reservoir to have senior priority would deplete the water in the river and compromise Teton Canal's ability to store water it has relied on for the past seventy years. Crane testified it would adversely affect Teton Canal shareholders because water stored in the Eureka Reservoir is instrumental in irrigating their crops late in the irrigation season. If Teton Canal is not able to fill the Eureka Reservoir, Teton Canal shareholders' businesses will be significantly impacted. Teton Canal and other storage appropriators under the *Perry* decree have come to rely on Teton Reservoir's junior priority status. There was significant evidence for the Water Court to determine that allowing Teton Reservoir to enforce a senior priority would prejudice Teton Canal. It has relied on Teton Reservoir's "junior priority" for nearly seventy years.

19

¶40 The Water Court correctly concluded that Teton Reservoir is barred by laches from asserting senior priority over Teton Canal for its 1902 Notice water right. Teton Reservoir's 1902 Notice and claim will be administered in the future as junior in priority to Teton Canal's 1936 Eureka storage right. We need not address whether the Water Court properly applied the doctrine of waiver because this issue is dispositive.

¶41 *Issue Three: Whether the Water Court erred in decreeing Teton Reservoir an annual volume totaling 60,000 acre feet for storage in the Bynum Reservoir.*

¶42 On cross-appeal, Farmers argues the Water Court erred in decreeing Teton Reservoir an annual volume for storage in the Bynum Reservoir in excess of Teton Reservoir's annual needs. Farmers further contends that Teton Reservoir is not entitled to carryover storage in the Bynum Reservoir. Teton Reservoir argues that it is entitled to 20,000 acre feet of carryover storage in the Bynum Reservoir. Teton Reservoir maintains that substantial evidence supports the Water Court's determination that Teton Reservoir was entitled to carryover storage.

¶43 Montana's Water Use Act requires that a final decreed water right must state the amount of water included in the right by volume for "reservoir storage rights."[7] Section 85-2-234(6)(b)(i)-(ii), MCA. Water storage, which stabilizes and conserves water supplies, is encouraged in this state. *Farmers*, ¶ 12 (internal citations omitted). The controlling principle of Montana water law is the right to beneficially use water—without beneficial use, the right ceases. *Curry v. Pondera Cnty. Canal & Reservoir Co.*, 2016

---

[7] The Act gives the Water Court discretion to declare both flow rate and volume if the water judge determines that both are needed "to adequately administer the right." Section 85-2-234(6)(b)(iii), MCA.

MT 77, ¶ 25, 383 Mont. 93, 370 P.3d 440 (internal citations omitted). This Court has acknowledged that an appropriator may have a right to carryover storage in a reservoir for beneficial use in subsequent years. *Federal Land Bank v. Morris*, 112 Mont. 445, 456, 116 P.2d 1007, 1012 (1941); s*ee McDonald v. State*, 220 Mont. 519, 537, 722 P.2d 598, 609 (1986).

¶44 The record supports the Water Court's decision to limit Teton Reservoir to a volume amount of 60,000 acre feet for storage in the Bynum Reservoir, including 20,000 acre feet for carryover storage.[8] The Water Court recognized that there is no evidence that provides a number for carryover water. Nevertheless, the totality of the circumstances supported a 20,000 acre feet volume limit for carryover storage. We agree.

¶45 The record reflects that Teton Reservoir's diversion amounts varied greatly from year to year and it has relied on carryover storage. The Water Court determined that 40,000 acre feet reflected the full allotment to Teton Reservoir shareholders. BID president DeBruycker testified that Teton Reservoir favored carryover water for next year rather than increasing the allotment to its shareholders. The 1962 Teton County Water Resource survey stated the Bynum Reservoir "average annual storage is 75,000 acre feet with a drawdown of about 35,000 to 40,000 acre feet of water used during the irrigation season." The record further supports that Teton Reservoir diverted as much water as it could but rarely filled the reservoir in one year. The Water Court noted the lack of

---

[8] Farmers does not appeal the allocation of 40,000 acre feet representing full allotment to shareholders.

21

evidence of the amount Teton Reservoir diverted each year for carryover storage stating, "the amount of carryover is less clear, but an additional 20,000 AF is a reasonable figure representing a high average of [Teton Reservoir's] historical diversions." The Water Court relied on what little information was provided by the water commissioner records and Teton Reservoir's table of reservoir levels. The Water Court further recognized there is no evidence indicating that Teton Reservoir's practices in regard to carryover storage have ever resulted in wasting water. Taken together, the record supports the Water Court's determination that Teton Reservoir historically has diverted and relied on carryover storage in the Bynum Reservoir. The Water Court's assignment of 20,000 acre feet of carryover storage in the Bynum Reservoir was supported by substantial evidence.

¶46    *Issue Four:  Whether the Water Court erred in refusing to limit Teton Reservoir's wintertime diversions to one-half of the available water in the Teton River.*

¶47    On cross-appeal, Farmers also argues that the Water Court erred by not limiting Teton Reservoir to one-half available flow during wintertime diversions. Specifically, Farmers contends the Water Court misapprehended the evidence regarding the water commissioners' historical water management practice. Teton Reservoir argues the Water Court did not err because there was substantial evidence to support that Teton Reservoir's wintertime diversions were not limited to one-half of the available flow. Teton Reservoir maintains that the Water Court did not misapprehend the evidence. The Water Court found that "the evidence at hearing indicates that Water Commissioners Olson and Blixrud did attempt to limit [Teton Reservoir] winter diversions to half the available flow in the Teton River." Despite this evidence, the Water Court determined that this water

22

management tool was not administering any decreed water right or applied in any consistent way.

¶48 Farmers argues that the District Court's 2009 order on Teton Reservoir's Dissatisfied Water User Complaint should control. In the order, the District Court directed the water commissioner to reduce the amount of water being diverted to Teton Reservoir "to be consistent with the prior practice of allowing half the river to flow downstream." District courts are granted the authority to supervise the distribution of water that has already been adjudicated and to enforce such water decrees. *Baker Ditch Co.,* 251 Mont. at 255, 824 P.2d at 260; § 85-2-406(3), MCA. However, district courts are not vested with the power to determine existing water rights. Section 3-7-501, MCA. Thus, a district court is bound by the existing water decree. *Baker Ditch Co.,* 251 Mont. at 255, 824 P.2d at 260. Therefore, the District Court's order resolving Teton Reservoir's Dissatisfied Water User Complaint did not alter Teton Reservoir's water right and is not controlling in the adjudication of Teton Reservoir's water right by the Water Court.

¶49 The Water Court determined that limiting Teton Reservoir to one-half of the available water from the Teton River during its wintertime diversion was a practice or tool implemented by the court-appointed water commissioners to manage the water rights on the Teton River. The water commissioners limited Teton Reservoir's diversion because the Department of Fish, Wildlife and Parks requested that it do so. The Department was not a party under the *Perry* decree.[9] Teton Reservoir's water right does

---

[9] The Water Court noted that the Ownership Index for Basin 41O did not include a Montana Department of Fish, Wildlife and Parks water right claim for the Teton River.

not contain a provision that restricts its water rights from being enforced in order to avoid a cessation of instream flow. Limiting Teton Reservoir's wintertime diversions to conserve water under the authority of the water commissioners is not based on Teton Reservoir's water right. Thus, the Water Court correctly decreed Teton Reservoir's wintertime diversion based on the 1902 Notice rather than on a practice implemented by the water commissioners.

¶50 The Water Court was free to determine based on the evidence available whether Teton Reservoir's water right historically had been limited to one-half of the available flow. Based on the record, the Water Court determined that Teton Reservoir was not limited to one-half of the available flow and there is no indication in the water commissioner records that such a policy was implemented or applied with consistency. The Water Court gave more weight to the testimony of Peebles and the water commissioner records than the testimony of previous water commissioners stating that such policy was implemented. The Water Court's refusal to limit Teton Reservoir's wintertime diversions to one-half of the available flow based on water commissioners' diversion practices was supported by substantial evidence.

## CONCLUSION

¶51 The Water Court's determination that Teton Reservoir's 1902 Notice was validly appropriated under the 1885 Act was correct. The Water Court's determination that Teton Reservoir is barred by the equitable doctrine of laches from claiming senior priority to Teton Canal's water right is also affirmed. With respect to Farmers' cross-appeal, the Water Court did not err in assigning the Bynum Reservoir a 60,000 acre

24

feet volume limit, including 20,000 for carryover storage, and refusing to limit Teton

Reservoir's wintertime diversions.

¶52 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JIM RICE
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER